J-S03017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KENT JONES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JESSICA JONES | : | No. 1261 MDA 2025 |

Appeal from the Order Entered August 15, 2025
In the Court of Common Pleas of Montour County Civil Division at No(s):
2021-00378

BEFORE:  DUBOW, J., BECK, J., and LANE, J.

MEMORANDUM BY BECK, J.:　　　　　**FILED: APRIL 8, 2026**

Kent Jones ("Father") appeals from the August 15, 2025 order entered by the Montour County Court of Common Pleas ("trial court") that denied his request for primary physical custody of his five-year-old son, C.J., and to relocate his residence from Montour County, Pennsylvania, to Redmond, Washington.  Because the trial court carefully and thoroughly considered the child's best interests as provided by the requisite statutory provisions, and we discern no abuse of discretion, we affirm.

The record reflects that C.J. was born in October 2019 in Montour County, Pennsylvania, during the marriage of Father and Jessica Jones ("Mother").  **See** N.T., 6/11/2025, at 136.  Prior to their marriage, in January of 2018, the parties moved from the State of Nebraska to a house purchased

by Father in Danville, Pennsylvania, because Father accepted new employment. *See id.* at 61, 64, 176.

Father is an industrial engineer who has focused his career in "manufacturing." *Id.* at 61. Father's position in Pennsylvania was that of "plant manager for the Danville plant" for a company that had multiple manufacturing plants. *Id.* at 64. According to Father, the position in Danville included "roughly a twenty percent pay raise[.]" *Id.* at 64-65. Father's career goal is to "eventually" attain "some sort of vice president global manufacturing type position." *Id.* at 65.

During the parties' marriage, they resided with Mother's minor son and daughter from a prior relationship, of whom she has always had "full custody." *Id.* at 174-75. Father has an adult daughter from his first marriage, but she resided out of state and not with the parties. *See id.* at 42-43, 166-67. Mother did not work outside the home while married to Father. *See id.* at 178.

On December 30, 2021, after more than three years of marriage, Father filed a divorce complaint against Mother, which included a count for custody of C.J. Around this same time, Mother left the residence with her son and daughter and went to a shelter because she was unemployed and had no income. *See id.* at 157-58, 178. C.J., who was two years old, remained with Father. *See id.*

A custody conciliation conference occurred while Mother was living in the shelter, which resulted in a March 17, 2022 interim order that awarded the parties shared legal custody, Father primary physical custody, and Mother partial physical custody for four hours every Saturday afternoon, and Monday through Thursday from after school until 5:00 p.m. at Father's residence. According to Mother, she exercised custody during the workweek as provided in the order by picking C.J. up from daycare and taking him to Father's residence, "and I would stay with him until [Father] got home, and my other two kids were with me." *Id.* at 179.

On August 5, 2022, when C.J. was not yet three years old, Father filed a notice of proposed relocation to the State of Delaware, alleging that the relocation was for new employment with a different company. *See* Notice of Proposed Relocation, 8/5/2022, at 2. Father described the position as "a promotion from Plant Manager to Site Director." *Id.*

By this time, the parties were divorced,[1] and Mother had obtained independent housing, although the record does not specify exactly when she obtained the housing. According to Mother, the March 2022 interim order remained in effect after she obtained housing through the time of Father's relocation request, but "a couple times I asked [Father] if [C.J.] could stay the night, and [Father] approved that[.]" N.T., 6/11/2025, at 179.

_____

[1] The certified docket reveals that the parties were divorced by order entered on May 3, 2022.

In his notice, Father requested that he maintain primary physical custody and Mother partial physical custody of C.J. *See* Notice of Proposed Relocation, 8/5/2022, at 2-3. Mother timely filed a counter-affidavit objecting to both the proposed relocation to the State of Delaware and to modification of the order. In addition, Mother filed a petition to modify the interim custody order, wherein she requested shared physical custody of C.J.

Prior to the evidentiary hearing, Father relocated to Delaware. He subsequently entered a custody stipulation with Mother for shared physical custody on an alternating two-week basis, which the trial court adopted as an interim order on October 25, 2022.[2]

In February 2023, Mother filed a petition for contempt against Father wherein she alleged that he refused to provide her with equal access to records from the daycare center C.J. attended while in Father's custody in Delaware. *See* Petition for Contempt, 2/6/2023, ¶ 5. Rather than proceed to an evidentiary hearing on the parties' outstanding requests, i.e., Father's relocation request, Mother's petition to modify custody, and her petition for contempt, the parties entered a stipulation for shared legal and physical custody of C.J. on a "two-week-on/two-week-off schedule," and the stipulation also set forth a holiday schedule. Custody Stipulation, 4/13/2023, ¶ 3(b). By

_____

[2] The certified docket reveals that the Honorable Richard W. Knecht presided over the underlying custody matter from the time of this relocation request up through and including the subject proceeding.

order dated April 17, 2023, the court adopted the stipulation as full resolution of the outstanding petitions.

On July 27, 2023, Father filed a praecipe initiating a new request for primary physical custody of C.J. The custody matter proceeded to conciliation, which resulted in a recommendation that the April 17, 2023 order remain in effect given that C.J. "is approximately [two] years away from attending school and the decision necessary for school enrollment is not pressing at this time." Information and Impressions, 10/23/2023, ¶ 15. The court issued an interim order adopting the recommendation in October 2023, to which Father timely filed exceptions.[3] The trial court scheduled a prehearing on Father's exceptions to occur on January 17, 2024, which resulted in court orders for a pretrial conference on December 9, 2024, and a custody hearing on January 8, 2025. In the interim, Father filed the relocation request underlying this appeal, and the trial court ordered that it be heard at the same time as the hearing on Father's exceptions. *See* Certified Docket, Nos. 70, 72-74, 82.

In the relocation request, Father alleged that he intended to move to Redmond, Washington for new employment on July 15, 2024—two weeks prior to the date he filed the notice. *See* Notice of Proposed Relocation,

_____

[3] In his exceptions, Father averred that a custody modification and relocation request was pending before the trial court. *See* Exceptions, 10/27/2023, ¶ 3. Our review of the certified docket, however, does not reveal another relocation request in this case until July 27, 2024, when Father filed the notice of proposed relocation to Redmond, Washington.

7/27/2024, at 2. Father requested that C.J. follow him to the State of Washington in September 2024. ***See id.*** Mother timely filed a counter-affidavit objecting to the proposed relocation and to modification of the custody order.

On November 25, 2024, prior to trial on Father's petition, the trial court issued an agreed-upon interim order "to schedule three [] months … with C.J. in Father's custody in the State of Washington." Trial Court Order, 11/25/2024. The custody trial occurred on June 11, 2025, and by then the parties had been exercising custody on an alternating three-month basis. ***See*** N.T., 6/11/2025, at 119. C.J., then five years old and entering kindergarten in the 2025/2026 school year, had started his three-month rotation with Father the same month as the trial.

Father testified on his own behalf, and he presented the testimony of his mother, Janice J. Jones, who resides in North Carolina, and Jane Simonsen, a Delaware resident who babysat C.J. while Father worked in Delaware. Mother testified on her own behalf.

With respect to his current employment, Father testified that he is the "director of operations for the Redmond campus," at a company that "creates aerial work platform devices for the construction industr[y]." N.T., 6/11/2025, at 60, 150. Father described his duties as being "much broader" than those while employed in Delaware. ***Id.*** at 63. Father testified that his

current income is $221,000, and that his salary has increased with each position:

> I've had progressive pay increases as I've transitioned from position to position. My salary[,] I would say[,] has been commensurate with my roles and responsibility. But each time, … I'm going to say it [has] been roughly a twenty percent pay raise role over role that I've been able to advance myself.

*Id.* at 65; *see also id.* at 143.

On July 13, 2024, immediately before relocating to Redmond, Father married Razel ("Stepmother"), whom he met through a matchmaking service called "Christian Filipina." *See id.* at 49, 52. Stepmother is from the Philippines, and she participated in the immigration process to move to the United States and marry Father. *See id.* at 49-52. There is no dispute that C.J. has a "very good" relationship with Stepmother. *Id.* at 53, 197. In addition, Stepmother was pregnant at the time of the trial, and her due date was late August 2025. *Id.* at 48.

Mother testified that, for the past two years, she has been living in an apartment in Bloomsburg, Pennsylvania, which is partially subsidized by the government, with her other son and daughter and C.J., when she has custody of him.[4] *See id.* at 174, 181, 233. Mother stated that C.J., as well as his

---

[4] Mother testified that her rent is more than $1,000 per month, and her subsidy amounts to "a little over a hundred dollars towards the rent." N.T., 6/11/2025, at 233. Mother testified that she resides in Bloomsburg and not Danville because the shelter located housing for her in Bloomsburg. *See id.* at 234.

half-siblings, each have their own bedrooms. *See id.* at 187. For approximately three years, Mother has been employed at a daycare center in Danville. *Id.* at 175.

Mother testified that C.J. has a "very strong" relationship with his half-siblings, who were eleven and twelve years old at the time of trial and had recently completed the fifth and sixth grades in the Bloomsburg School District. *Id.* at 180-81, 184. Mother had registered C.J. for kindergarten in the same school district for the 2025/2026 school year. *See id.* at 187. In addition, Mother testified that she has no intention of leaving Bloomsburg given that her children are settled there. *See id.* at 188-89.

By opinion and order dated and entered on August 15, 2025, the trial court denied Father's relocation request. The order awarded the parties shared legal custody, Mother primary physical custody, and Father partial physical custody as follows:

> 4. Father shall have partial physical custody every year during the summer from the first Sunday after school ends until one week before school begins.
>
> 5. Every year Father shall also have all of Christmas break, including Christmas Eve and Christmas Day, from the day after Christmas break begins, until two (2) days before the start of school after the New Year.

Trial Court Order, 8/15/2025, ¶¶ 4-5.

Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on

September 12, 2025. The trial court issued its Rule 1925(a)(2)(ii) opinion on October 6, 2025.

On appeal, Father presents the following issues for review:

I.  The trial court erred as a matter of law in its statutory interpretation of 23 Pa.C.S. [§] 5337(h), the relocation factors, as the trial court only peripherally addressed the statutory relocation factors, instead, focusing almost exclusively on "stability," which by its very nature is contrary to the relocation request, as any relocation requires a temporary instability for a minor child in an effort to provide an environment for the minor child which serves his or her best interest in the future.

II.  The trial court erred as a matter of law or abused its discretion in making its conclusions about "stability," as there are no facts of record for the trial court to, for example, conclude that Father was not actively involved as a parent while the parties lived in Danville, when Mother voluntarily left the marital residence and left Father with primary physical custody for a period of time; that Father is likely to move again, despite the fact that he testified that he was likely to remain at [his current employer] seeking career advancement within that corporation; that C.J., while suffering no effect of the move to Delaware and move to Redmond could possibly suffer effects if Father is to relocate again; and that Mother with her varied work schedule offers greater stability for C.J. moving forward.

Father's Brief at 36 (unnecessary capitalization omitted; punctuation added).

In reviewing a custody order, "our scope is of the broadest type and our standard is abuse of discretion." *White v. Malecki*, 296 A.3d 1210, 1213 (Pa. Super. 2023) (citation omitted). This Court has explained:

We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses

- 9 -

first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Id.* (citation omitted).

With respect to child custody cases, the "paramount concern is the best interest of the child involved." ***Rogowski v. Kirven***, 291 A.3d 50, 61 (Pa. Super. 2023) (quotation marks and citation omitted). "This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child." ***M.J.M. v. M.L.G.***, 63 A.3d 331, 334 (Pa. Super. 2013) (citation omitted). "[E]ach parent shares the burden of proving, by a preponderance of the evidence, that an award of custody to him or her would serve the best interests of the [c]hild." ***White***, 296 A.3d at 1215 (quotation marks and citation omitted).

Pursuant to the Child Custody Act, a custodial party seeking to relocate a child's residence must first provide notice to the other custodial party or parties. 23 Pa.C.S. § 5337(c). If a party objects to the relocation, the court must hold a hearing and consider whether relocation is warranted under the statutory relocation factors, giving "weighted consideration to those factors which affect the safety of the child." *Id.* § 5337(g), (h). The factors include:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with

- 10 -

the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

*Id.* § 5337(h).

If the proposed relocation "will result in a change in custody, the court must also consider the custody factors in [s]ection 5328(a)." *S.S. v. K.F.*, 189 A.3d 1093, 1098 (Pa. Super. 2018). At the time of the trial court's

- 11 -

decision on the relocation petition in this case, the Child Custody Act set forth nineteen factors that a court must consider prior to modifying an existing custody order. **See** 23 Pa.C.S. § 5328(a).[5] "All of the best interest factors … are required to be considered by the trial court when entering a custody order." **D.Q. v. K.K.**, 241 A.3d 1112, 1118 (Pa. Super. 2020) (citation and brackets omitted). While a court's consideration of these factors is mandatory, "it is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." **E.B. v. D.B.**, 209 A.3d 451, 460 (Pa. Super. 2019) (citation omitted). The court, however, "should avoid dissociating the issue of primary custody from the issue of relocation, and should instead decide the two issues together under a single umbrella of best interests of the children." **S.S.**, 189 A.3d at 1098 (quotation marks and citation omitted).

The custody factors at issue here included:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

---

[5] The General Assembly has since amended the section 5328(a) custody factors. **See** 23 Pa.C.S. § 5328 (Act of June 30, 2025, P.L. 18, No. 11, § 1, effective Aug. 29, 2025).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's

effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a) (effective Aug. 13, 2024, to Aug. 28, 2025). The trial court must give "substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child." *Id.*

In this case, the trial court set forth its assessment of the relocation and custody factors in its opinion that accompanied the subject order. *See* Trial Court Opinion, 8/15/2025, at 3-13. With respect to the relocation factors, the court found that section 5337(h)(6) weighed slightly in favor of relocation, but found subsections (1), (2), (3), (7), (8), and (10) weighed against relocation.[6] The court found the remaining relocation factors inapplicable.

With respect to the custody factors, the court weighed none in Father's favor. The court found section 5328(a)(3), (4), (6), (11), and (12) weighed in Mother's favor. The court found subsections (1), (2.3), (5), (8)-(10), (13),

---

[6] With respect to subsections (7) and (8), the court found that they slightly weighed against relocation.

- 14 -

and (15) equally favored Mother and Father, and it found the remaining custody factors inapplicable.

In sum, the court explained in its Rule 1925(a) opinion that it found

Mother has sustained her burden of proof that she has established the integrity of her motives in opposing the relocation based upon the stability of her household and the bond between C.J. and his siblings[,] and that it is in C.J.'s best interests to remain in the primary physical custody of Mother.

Father has not met the burden of proof in establishing that it is in the best interest of C.J. to relocate.

Trial Court Opinion, 10/6/2025, at 22.

In his first issue, Father argues that the court misapplied the section 5337(h) relocation factors by "focusing on 'stability,' rather than performing a full and comprehensive evaluation" of the relocation factors. Father's Brief at 52. Father asserts that any relocation inherently "requires a temporary instability for a parent and child" even when the relocation is in the best interest of the child.[7] *Id.* at 37. In this case, Father specifically contends that

_____

[7] In support of his argument, Father cites *Prabakaran v. Johnson*, 279 A.3d 1291 (Pa. Super. 2022) (non-precedential decision), wherein this Court affirmed an order transferring primary physical custody of the child from the mother in Pennsylvania to the father who resided in Michigan. Father analogizes this case to *Prabakaran* by claiming that the relocation of the child in *Prabakaran* "will affect the status quo and cause temporary distress[;] however, this temporary distress caused by the move was outweighed by the need to place the child in a place that will best allow him to thrive emotionally, academically and physically." Father's Brief at 52-53. That, however, was not *Prabakaran*'s holding. In fact, this is a proposition not found in that case. To the contrary, the custody dispute in that case did not result from the relocation of either parent. Therefore, the trial court was not required to
*(Footnote Continued Next Page)*

the trial court's conclusions under section 5337(h)(2), (3), and (7) are unsupported by the evidence. We address them seriatim.

With respect to section 5337(h)(2)—the age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational, and emotional development—the trial court found, in relevant part:

> C.J. is young. It can be argued that the move or reshaping of physical custody will have less impact upon him at his current age. However, in this case, it would be taking C.J. away from the stability that he has known since the divorce and that he has had and relied upon as Father moved away from their home (Danville, Pennsylvania) and then away from Delaware. While C.J. appears to have experienced these moves without major setbacks, it can be argued that the stability provided by Mother and his half-siblings has made this transition easier for C.J.
>
> C.J. may also experience the disruption that an infant child in the household may make when Father's new wife gives birth to their child.

Trial Court Opinion, 8/15/2025, at 10.

---

consider section 5337 in its entirety. *See D.K. v. S.P.K.*, 102 A.3d 467, 474 (Pa. Super. 2014). Because the change in custody in *Prabakaran* would require the child to move a significant distance, the court was required to "consider the relevant relocation factors of section 5337(h) in its section 5328(a) best interest analysis." *Id.* at 476. Given this applicable law, the mother in *Prabakaran* argued that the trial court failed to consider all relevant relocation factors. The mother did not argue that the trial court abused its discretion in its findings related to those factors. Because this Court concluded that the court in *Prabakaran* assessed the relevant relocation factors, we affirmed the order. As such, *Prabakaran* is inapposite to this case And Father's reliance is misplaced.

- 16 -

Father contends that the foregoing conclusions are not supported by the evidence and "focus solely on [the court's] perceived 'stability' with Mother." Father's Brief at 41. Father specifically asserts that the court failed to address "that Mother left the parties' household in late 2021 with her two [] children, leaving C.J. solely with Father — only visiting C.J. minimally at various times at the parties' residence in Danville. Father thereafter assumed primary physical custody of C.J." *Id.* at 41-42.

To the extent Father contends that this amounted to abandonment by Mother, the record does not support this claim. The trial court addressed this under section 5337(h)(1), i.e., the nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life. The court found that Mother, upon separation, "moved out of Father's house because it was 'his' house[.]" Trial Court Opinion, 8/15/2025, at 9. This is supported by the record, as Mother testified that Father purchased the house in Danville when they relocated from Nebraska. *See* N.T., 6/11/2025, at 177. Mother confirmed that she had moved from Father's house to a shelter when the parties' divorce was pending because she had been a stay-at-home mother and did not have a job. *See id.* at 178. C.J. was two years old, far from Mother abandoning him, she exercised physical custody pursuant to the March 2022 interim order, as described above. As she explained, "I was not awarded overnights because I was in the [shelter]."

*Id.* at 179. Thus, we discern no abuse of discretion by the court in declining to weigh Father's interim primary physical custody award in his favor.

Further, the record supports the trial court's finding that C.J.'s greatest source of stability since the parties' divorce has been Mother and his half-siblings who reside in Bloomsburg. We note that Father's current position in Redmond, Washington, does not satisfy his ultimate career ambition. *See* N.T., 6/11/2025, at 65-66. Father testified on direct examination, in pertinent part:

> My global vice president of manufacturing intends to retire in a few years. He [has] already had conversations with me about potentially replacing him and a promotion when he retires.
>
> So I do think that [my current company, which is part of a larger corporation, that] owns multiple companies globally and within the United States they have 13 manufacturing sites within the United States alone within all their brands. So[,] there is a significant amount of potential upward mobility for myself within [my current company] and in the [larger] corporation.

*Id.* at 66. Father testified that the global vice president position would be available in "probably three years," and "could" involve him relocating to Bothell, Washington. *Id.* Father stated that Redmond and Bothell are "20, 40 minutes away from each other." *Id.* at 67. Although Father testified, "[w]ith the information I have available today, my assumption is that I will remain in [the] Redmond region within the [same] corporation, the record further reveals that Father leased his residence in Redmond. *Id.* at 68, 151. For her part, Mother was of the view that Father will not remain in Washington

for an extended period of time " "[b]ased upon what I've been told by [Father] every time he moves." *Id.* at 200.

Based on the evidence of record, including the testimony the trial court found to be credible, we discern no abuse of discretion by the court determining that Mother has provided stability for C.J. and will continue to do so by remaining in Bloomsburg. Thus, we do not disturb the trial court's findings pursuant to section 5337(h)(2).

With respect to section 5337(h)(3)—the feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties—the court found:

> Father favors less time given to Mother, were he awarded primary physical custody of C.J., as opposed to Mother's willingness to allow Father to have more time if she obtains primary physical custody.[8] It is clear that Mother has a goal of ensuring that C.J. maintains a relationship with Father no matter where he relocated. Father will have the financial resources to make this happen.
>
> Logistically and financially, Father's move has added a degree of complication to custody exchanges. Father will be approximately 3000 miles away and there are legitimate concerns as to the travel arrangements. Father will have the financial

---

[8] If awarded primary physical custody during the school year, Father proposed that Mother be awarded custody every spring break, which was for one week in the Redmond school district, and to alternate the two-week Christmas holiday. *See* N.T., 6/11/25, at 119-20. Father proposed for the summer that Mother be awarded five weeks of custody starting the last week of June until the end of July. *See id.* at 120-21. In contrast, Mother proposed that, should she be awarded primary physical custody, Father be awarded custody every two-week Christmas holiday and the full summer every year. *See id.* at 199.

resources to minimize any complications and to assure C.J.'s safe travel.

Trial Court Opinion, 8/15/2025, at 11.

Father argues that the court misinterpreted his intent in proposing a custody schedule for Mother. Specifically, he asserts that he intended for Mother to "have more frequent periods of custody as opposed to having one [] extended period of custody mostly in the summer." Father's Brief at 44. The record supports the trial court's findings. In contrast to Mother's proposal, Father testified that he wanted to alternate annually the physical custody of C.J. during the Christmas season. In addition, he proposed that Mother have custody the first five weeks of summer vacation every year because "I think it's very important that both parents have summertime[.]" N.T., 6/11/2025, at 121. The only other proposal offered by Father was that Mother have custody during C.J.'s spring break from school. *See id.* at 120. Based on our review, Father did not demonstrate that he placed much value on C.J. maintaining his relationship with Mother and his half-siblings. Mother, however, testified that she believed it was "absolutely" important for C.J. to have a relationship with Father and that she would only encourage, and not prevent, their continuing relationship. *Id.* at 195. Her custody proposal confirms the value that she places on C.J. maintaining his relationship with Father. As the trial court weighed the competing testimony and properly considered the logistics of travel and the parties' financial circumstances, we find no abuse of discretion in its consideration of subsection (h)(3) and

conclude that its reasoning is well supported in the record. Father's claim fails.

Finally, with respect to section 5337(h)(7)—whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity—the court found:

> Father's increase in salary should benefit Mother in the sense that she may be entitled to an increase in child support. There is no evidence of record that C.J. suffers from not having food, shelter, or other benefits tied to economic superiority. Material goods alone do no[t] automatically translate to emotional stability or growth, or happiness. The balance between Mother and Father thus far has benefited C.J. in all categories. It does not benefit C.J. to disturb this.

Trial Court Opinion, 8/15/2025, at 12.

Father asserts that the court erred in failing to consider that Redmond, Washington, "is an extremely nice area, a culturally diverse area and an area that offers many cultural advantages," and "offers activities, which will improve C.J. academically, culturally and socially." Father's Brief at 45. In addition, Father baldly asserts that the court erred by failing to consider "the enhanced academic opportunities that C.J. would be exposed to" if he relocated to Redmond.[9] *Id.* at 46. Further, Father asserts that the court erred by not considering that the Redmond elementary school C.J. would attend "is very highly ranked academically in the State of Washington" with

---

[9] Father does not refer us to where in the record evidence of enhanced academic opportunities exists. Presumably he is referring to his own testimony concerning the school district in which he resides.

"a good student-to-teacher ratio and … is very culturally diverse[.]" *Id.*
Regarding the school district in which Father currently resides, he testified
that it "is in the top 5 percentile for the entire State of Washington in terms
of academic scores," and that standardized test scores in the Bloomsburg
School District were "significantly lower in general compared to the Redmond
School District." *Id.* at 77, 81. Further, Father testified that he researched
the standardized test scores for the Bloomsburg School District, and "it was
significantly lower in general compared to the Redmond School District." *Id.*
at 81.

> With respect to the activities that exist in Redmond, Father testified:
>
> So Redmond[,] Washington … the metropolitan area offers quite
> a bit. And it's very interesting. You have the Cascade Mountains
> and the Hoh Rainforest, which is off to the west on the Pacific side,
> and we're planning to go visit that this summer. And then on the
> east side you have the Cascades mountain range, Mount Rainier,
> and many national parks out on the east side.

N.T., 6/11/2025, at 59-60. In addition, Father testified that Seattle, which is
approximately forty-five minutes away from Redmond, offers museums and
theater districts, among other activities. *See id.* at 87.

We are unpersuaded by Father's claims. The trial court heard Father's
testimony and gave it the weight to which it believed it was due. Although
Father testified about the variance between the school districts in which he
and Mother live, he provided no support for his claims. We reject Father's
argument that the court erred by not addressing what differences, if any, exist
between the Redmond and Bloomsburg school districts. C.J. was entering

- 22 -

kindergarten in the 2025-2026 school year. As such, the child did not yet have an academic record, and there is no evidence that he would receive a substandard education in the Bloomsburg school district.

To the extent Father argues that the court erred by not prioritizing activities unique to the Redmond metropolitan area in fashioning its order, his argument fails based on our well-settled standard of review. *See White*, 296 A.3d at 1213 ("[W]ith regard to issues of … weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.") (citation omitted). Moreover, Father fails to acknowledge that he can take C.J. to visit and participate in these activities during his custodial periods provided for in the order.

The court did not find any evidence that the child's emotional stability would be enhanced if he relocated to Redmond. Rather, the court credited C.J.'s existing emotional health, in part, to the stability of Mother's household and his bond with his half-siblings. We again will not disturb the court's decision to prioritize maintaining the child's emotional stability under section 5337(h)(7) after observing first-hand the competent evidence offered in this case and the court's familiarity with C.J. and the parties. *See id.*

In his second and final issue on appeal, Father similarly argues that the court abused its discretion by prioritizing C.J.'s stability when weighing the

section 5328(a) best interest factors.[10]  Specifically, Father asserts that the court erred with respect to section 5328(a)(3), (4), (6), (9), and (12).  We again address his arguments seriatim.

The court weighed section 5328(a)(3), i.e., the parental duties performed by each party on behalf of the child, in Mother's favor, as follows.

> While married, Mother was a "stay-at-home mother."  Father, due to work obligations, relie[d] on Mother to perform these duties.  While Father took a more active role while residing in Delaware, the testimony established that it is likely that his new spouse would be performing the majority of these duties in Washington, especially given consideration to the fact that Father and his new spouse will be having a child and that Father will be immersed in his new employment.

Trial Court Opinion, 8/15/2025, at 4.

Father argues that the trial court erred to the extent it concluded that Mother "resumed her role as primary physical custodian after the parties' divorce."  Father's Brief at 55.  Our review reveals that the court made no such finding.  Rather, it concluded that Stepmother would be performing the majority of parental duties while C.J. is in Father's custody.  Father's testimony supports this finding inasmuch as his work hours in Redmond are approximately 5:00 a.m. to 5:00 p.m., Monday through Thursday.  **See** N.T., 6/11/2025, at 153.  Father acknowledged that Stepmother would be responsible for C.J. getting to and from school.  **See id.**  Father also testified

---

[10] Throughout the argument section of his brief concerning his second issue, Father erroneously cites section 5338, rather than section 5328, of the Child Custody Act.  **See** Father's Brief at 54-59.

that he assisted C.J. in developing a relationship with Stepmother, in part, by "trying to set a[n] understanding for [C.J.] that it's okay to have two mothers, if you will[.]" *Id.* at 54. Thus, we discern no abuse of discretion by the court concluding that Stepmother will perform the majority of parental duties for C.J. while in Father's custody.

Father alternatively argues that the court abused its discretion with respect to this same custody factor because "Mother has to rely on unnamed third parties to assist with getting C.J. to the bus stop in the morning and for his return to her residence after school." Father's Brief at 56-57. The record again does not support this assertion.

Mother testified that she leaves for work at 6:45 a.m. and, during the past year, her other children's school bus arrived at approximately 7:15 a.m. and that her next-door neighbors, who "have the same age kids[,] … wait outside with them." *See* N.T., 6/11/2025, at 214-15. However, Mother testified that her employer agreed to adjust her work schedule so that she will be available during the upcoming school year to put C.J. on the school bus at approximately 8:15 a.m. *See id.* at 207. Likewise, Mother testified that she had made arrangements with her employer so that she will be available for C.J after school and that she will be present "to pick him up" from the bus stop. *See id.* at 188, 198. Mother explained that she trusts her employer to honor these agreements because her employer "worked with me in the past … with this whole custody battle … she's worked with me with my other two

kids." *Id.* at 216. Based on this testimonial evidence, we conclude that Father's argument concerning section 5328(a)(3) is meritless.

With respect to section 5328(a)(4)—the need for stability and continuity in the child's education, family life and community life—the court found, in relevant part:

> While it is unfortunate that there will inevitably be disruption in the child's life due to Father's decision to relocate twice, with the most recent relocation greatly expanding the geographical distance between Mother and Father, having the minor child remain in Mother's home with his half-siblings, with whom he has a close relationship, will be best for the child's stability and continuity in his education, family life, and community life.
>
> Importantly, the risk of granting Father's relocation, based upon his track record of relocation throughout his life, poses an instability risk to C.J. While Father's movement is for the purpose of continuously seeking career enhancement, it is more likely than not that if the relocation is granted, then C.J. will be relocating again within several years — as Father's track record demonstrates. In and of itself, this is not dispositive, or necessarily negative. However, if C.J. stays with Mother, then he will ultimately have family and stability as the cornerstone of his youth; while maximizing his time with Father during extended periods[.]

Trial Court Opinion, 8/15/2025, at 5.

Father argues that the court abused its discretion by finding that he will likely relocate again with C.J. if relocation is granted this time. Father's Brief at 57. Specifically, Father asserts there is no testimony that he "intended to move again." *Id.* We discern no abuse of discretion.

Father's history of multiple relocations for career advancement is without dispute. Further, as discussed above concerning section 5337(h)(2),

Father's position in Redmond does not satisfy his ultimate career objective. *See* N.T., 6/11/2025, at 65-66. Father will consider becoming the global vice president of his company and testified that this position would be available in "probably three years," and "could" involve him relocating to Bothell, Washington, which is "20, 40 minutes" from Redmond. *Id.* at 66-67. Moreover, Father testified that "there is a significant amount of potential upward mobility for myself within [my current company] and in the [larger] corporation," which he described as owning "multiple companies globally and within the United States they have 13 manufacturing sites … alone[.]" *Id.* at 66. Again, as noted hereinabove, Father leases his residence in Redmond, which further supports the possibility of another relocation. *Id.* at 68. Thus, we conclude that the record amply supports the trial court's findings under section 5328(a)(4).

With respect to section 5328(a)(6), the child's sibling relationships, the court weighed it significantly in Mother's favor. The court found, in pertinent part:

> Mother has two [] other minor children who have significant bonds with the minor child. C.J. was born "into" Mother's family and has been raised with her children[.] This continued throughout the [p]arties' marriage and after Father relocated to Delaware.
>
> \*     \*     \*
>
> … Moving C.J. primarily to Father's home approximately 3000 miles away from Mother and his half-siblings is not in the best interest of C.J.

Trial Court Opinion, 8/15/2025, at 5-6.

Father argues that the trial court abused its discretion in failing to consider that he and Stepmother's anticipated child would likewise be a half-sibling to C.J., and that the court's decision will deprive C.J. of having "the bonding experience with" Father's new child. Father's Brief at 58. We again discern no abuse of discretion.

The record supports the court's findings that C.J. has known his older siblings on Mother's side his whole life and he is strongly bonded with them. *See* N.T., 6/11/2025, at 183-84 (Mother's testimony that C.J. and his older siblings are playmates; C.J.'s relationship with them is "very strong," and they are "very close."). Further, there is no support for the contention that the custody order will deprive C.J. of a "bonding experience" with Father's new child. C.J. will have ample opportunity to bond with his new sibling over the Christmas holiday and the entire summer every year. Father's claim fails.

Turning to subsections (a)(9) (which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs) and (12) (each party's availability to care for the child or ability to make appropriate child-care arrangements), the record reflects the court found the former to be neutral and the latter to favor Mother:

> Both parties are likely to maintain a loving, stable, consistent, and nurturing relationship with the child that is adequate for the child's emotional needs. However, Mother will likely be more available to the minor child due to her work schedule. Additionally, the minor child will be raised with his half-siblings. Father will be coping with maintaining a new job in which

- 28 -

he will seek to advance. Therefore, certain responsibilities will fall upon his new wife, as she will also attend to their infant child.

\* \* \*

While both parents have demonstrated that they can make appropriate childcare arrangements, it appears that Mother will be more likely to provide the childcare herself, as opposed to engaging the services of a third party, or relying upon Stepmother

Trial Court Opinion, 8/15/2025, at 7, 8 (cleaned up). "

Taking these findings together, Father argues that the court abused its discretion, asserting once again that Mother "requires third parties to stay with C.J. in the mornings to place him on the bus and in the afternoon to get him off of the bus and supervise him until Mother returns home from work." Father's Brief at 58-59. As discussed above, Mother's testimony contradicts Father's argument, and the court was free to credit it. *See Whitei*, 296 A.3d at 1213.

To the extent that Father argues that the court erred by concluding that Mother will be more likely than he is to provide childcare herself, we disagree. Although Mother testified that her work hours "do vary right now," she nonetheless stated that she woke both of her children for school in the morning this past year, exercised her parental duties, and established daily routines. *See* N.T., 6/11/2025, at 189, 214. In contrast, Father testified that he works approximately twelve-hour days Monday through Thursday, starting at 5:00 a.m. *See id.* at 153. Thus, we conclude that the record supports the court's findings under section 5328(a)(9) and (12).

The trial court reviewed the relocation and custody factors and found that relocation with Father to Washington was not in C.J.'s best interest. As the record supports the trial court's findings, we have no basis to reverse its decision. *See A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) ("Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion."). As such, we affirm the custody order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/08/2026